UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>THE CELLULAR TELEPHONE BEARING IMEI NUMBER ▓▓▓▓▓▓3494 AND PRESENTLY ASSIGNED CALL NUMBER ▓▓▓▓▓1322 | Case No. 19-mj-241-01-AJ |

**AFFIDAVIT IN SUPPORT OF**
**<u>SEARCH WARRANT</u>**

I, Kevin Rutina, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1. I submit this affidavit in support of an application for a search warrant for the cellular telephone bearing IMEI number ▓▓▓▓▓▓3494 and presently assigned call number ▓▓▓▓▓1322 (the "Target Device"). The item to be searched is more particularly described in Attachment A, and the items to be seized are more particularly described in Attachment B. The facts set forth herein are based upon my work on this investigation, a review of reports written by other law enforcement officers, and discussion about the investigation with those officers. In submitting this affidavit, I have not included every fact known to me about the investigation but only the facts that I believe are sufficient to establish probable cause for the requested search warrant.

2. I am a Trooper First Class with the New Hampshire State Police Narcotics Investigations Unit assigned as a Drug Enforcement Administration ("DEA") Task Force Office with the Southern New Hampshire DEA High Intensity Drug Trafficking Area Task Force in the Manchester District Office and have been so assigned since March 2019. I have been employed by the New Hampshire State Police since February 2008. My duties and responsibilities include

the investigation of federal crimes, including violations of 21 U.S.C. §§ 841(a)(1) and 846. I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, and other substances. I have received significant training in the field of narcotics enforcement and investigations. Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, debriefings of subjects, witnesses, and confidential informants, and reviews of consensually recorded conversations, meetings, and Title III intercepts.

## PROBABLE CAUSE

3. For background, since 2018, numerous cooperating sources informed various law enforcement officers that an individual who goes by "Chino" was a prolific supplier of controlled substances in the Manchester, New Hampshire area. The sources consistently and independently described Chino as a Dominican male with a muscular build and numerous tattoos. As described in detail below, further investigation confirmed that Chino is ARIAS-MEJIA and that ARIAS-MEJIA was engaged in a conspiracy to distribute controlled substances in violation of Title 21, United States Code, Sections 841(a)(1) and 846, until his arrest on November 20, 2019.

4.	Approximately one week prior to June 25, 2019, a cooperating source ("CS-1")[1] began communicating with Chino at the direction of detectives of the Manchester, New Hampshire Police Department, regarding a purchase of ten "fingers." Based on my training, experience in this and other investigations, and conversations with other law enforcement officers, I know that a "finger," also called a "stick," is commonly used slang for a compressed cylinder containing ten grams of a substance containing fentanyl, heroin, or a combination thereof. CS-1 and Chino agreed that they would exchange ten fingers for $2500 and that the deal was to occur on June 25, 2019 at ▬▬▬▬ Street, ▬ in Manchester. CS-1 was given $2500 in currency and provided with a device to covertly audio and video record the transaction. Under surveillance by law enforcement, CS-1 drove to ▬▬▬▬ treet and entered ▬▬▬▬ Street. Approximately 20 minutes later, CS-1 departed ▬▬▬▬ Street and drove away from the area. CS-1 met officers at a predetermined location and CS-1 provided officers with a bag containing items consistent with the appearance of "fingers" of heroin/fentanyl. CS-1 stated that in the apartment, CS-1 gave Chino the money and Chino gave CS-1 the bag containing the sticks. Officers later opened the bag and observed what appeared to be eight full fingers and four half fingers (5 grams each) for the agreed-upon 100 grams total. The audio and video recording confirms CS-1's account of the transaction and Chino is clearly visible in the video. As discussed further below, the physical appearance of Chino in the video matches that of ARIAS-MEJIA.

---

[1] CS-1 was introduced to law enforcement via another cooperating source, identified below as CS-2. CS-1 was cooperating in exchange for financial compensation and has received one payment of $5000. CS-1 has no criminal convictions and has been reliable throughout this investigation.

5. On July 23, 2019, officers met with a second cooperating source ("CS-2")[2] who had a history of conducting drug transactions with the same individual known as Chino. CS-2 reported that Chino had obtained a new telephone number. CS-2 stated that CS-2 worked as a sub-distributor for Chino and would typically receive a large bag containing a variety of pre-packaged drugs, to include several full fingers and half fingers of heroin/fentanyl, and small baggies (intended for sale to an end-user for $40 apiece) of crack cocaine, powder cocaine, and heroin/fentanyl. In the presence of officers, CS-2 placed a call to Chino's new number. Chino told CS-2 that CS-2 owed $1500 for prior transactions, and CS-2 told Chino that CS-2 needed additional drug product.

6. On July 24, 2019, CS-2 again called Chino in the presence of officers. Chino directed CS-2 to go see "Niki" to pay the existing drug debt and to obtain new supply. CS-2 explained to officers that Niki was previously known to CS-2 and works for Chino by running a drug distribution house on ▒▒▒▒ Street in Manchester. CS-2 was given $1520 in currency and provided with a device to covertly audio and video record the transaction. Under surveillance by law enforcement, CS-2 met with Niki within an apartment on ▒▒▒▒ Street and gave Niki the currency for payment to Chino. Niki asked CS-2 what new drugs CS-2 needed, and CS-2 requested 4.5 sticks (of heroin/fentanyl) and 15 bags of crack cocaine. Niki stated that Chino had called her to let her know that CS-2 was coming. Niki went to the bedroom and obtained the requested drugs and gave them to CS-2. CS-2 departed ▒▒▒▒ Street and met officers at a

---

[2] CS-2 began cooperating with law enforcement in or about May of 2019 in mitigation of pending charges for drug possession, and later for financial compensation, and has received one payment of $5000. CS-2 has convictions for controlling a premises where drugs are kept and for driving after revocation. CS-2 has an active addiction to opioids. The information provided by CS-2 about Arias-Mejia has always been reliable, in that it is corroborated by independently obtained intelligence and audio/video recorded evidence. Subsequent to CS-2's involvement described herein, CS-2 was discontinued as a source of information due to CS-2's addiction.

predetermined location where CS-2 debriefed officers about the transaction and provided officers with the substances obtained from Niki. The 4.5 sticks obtained from Niki were later confirmed via laboratory testing to contain 44.5 grams of a substance containing a detectable amount of fentanyl, and the 15 small bags obtained from Niki resulted in a positive field test for cocaine base.

7. On July 25, 2019, CS-2 again called Chino in the presence of officers to request additional drugs, and Chino directed CS-2 to an address on ▬▬▬▬ Street in Manchester. CS-2 was given $1900 in currency and provided with a device to covertly audio and video record the transaction. Under surveillance by law enforcement, CS-2 went to the address on ▬▬▬▬ Street and met with an individual known to CS-2 as Troy within Troy's residence. Troy then directed CS-2 to speak to Troy's wife, Rose, who was also in the residence. Rose stated that she would provide CS-2 with all of the drugs she currently had and provided CS-2 with packages that were later confirmed via laboratory testing to contain 2.7 grams of fentanyl in small bags, 34.3 grams of fentanyl in fingers, and .143 grams of cocaine.

8. Because CS-2 purchased all of Rose's product, CS-2 called Chino and stated that CS-2 needed additional product. Chino directed CS-2 to contact a person known to CS-2 as "Juno," from whom CS-2 had purchased narcotics in the past. In the presence of officers, CS-2 called Juno at a number that CS-2 already knew from their prior interactions and arranged to meet Juno at Juno's apartment on ▬▬▬▬ Street. Under surveillance by law enforcement, CS-2 went to the address on ▬▬▬▬ Street and conducted an additional controlled purchase of packages that were later confirmed to include 15.2 grams of fentanyl in fingers and 5.67 grams of fentanyl in small bags.

9.      Subsequent to the controlled purchases described above, CS-1 and/or CS-2 conducted six additional controlled purchases of suspected controlled substances arranged through Chino. These purchases occurred from July 26, 2019 to August 8, 2019.

10.     During the course of the investigation of Chino, several sources of information who knew Chino attempted to provide law enforcement with his actual birth name from the Dominican Republic. In an effort to identify Chino, an FBI employee in the Dominican Republic queried databases of Dominican nationals, looking for any names that sounded similar to the name approximations provided by those sources. The FBI employee located a financial record for Wilgfrido Valnodis ARIAS-MEJIA with a photograph that matches the appearance of Chino. This type of record is commonly used with success in identifying Dominican nationals operating under false identities in the United States. Officers then ran a facial recognition query for that photograph through a government database, which returned a match to a driver's license photo from Massachusetts under a name with initials M.V. with a social security number originating from Puerto Rico. Officers then obtained the Puerto Rican Department of Motor Vehicles record for that name and social security number, and the photograph in that record does not match the appearance of ARIAS-MEJIA. In other words, it appears that ARIAS-MEJIA purchased or stole the identity of M.V. and used documents bearing M.V.'s identifiers to obtain a Massachusetts driver's license with ARIAS-MEJIA's photograph on it, while the real M.V. continues to reside in Puerto Rico and has a Puerto Rican driver's license.

11.     On November 20, 2019, a criminal complaint was filed against ARIAS-MEJIA in this Court, case number 19-mj-237-01-AJ, and an arrest warrant issued for ARIAS-MEJIA. ARIAS-MEJIA was arrested the same day on a public street in Manchester, New Hampshire. At the time of arrest, ARIAS-MEJIA had the Target Device in the pocket of his sweatshirt.

## USE OF THE TARGET DEVICE

12. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that as a general matter, it is a common practice for drug traffickers to work in concert with other individuals and to do so by utilizing cellular phones to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involving the trafficking of drugs generate many types of evidence including voicemail messages referring to the arrangements of travel and payment, names, photographs, text messaging, and phone numbers of co-conspirators.

13. As discussed above, ARIAS-MEJIA routinely used telephones to arrange drug transactions with CS-1 and CS-2. ARIAS-MEJIA also necessarily communicated with co-conspirators, including Niki, Troy, Rose, and Juno to facilitate the transactions with CS-1 and CS-2.

14. I therefore believe that ARIAS-MEJIA's cellular telephone is likely to contain evidence of violations of 21 U.S.C. §§ 841(a)(1)(A) and 846

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

15. It is not possible to determine, merely by knowing a device's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. An increasing number of cellular service providers and device manufacturers now allow for their users to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards

inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must examine the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

16. Following the issuance of this warrant, I will collect the Target Device and subject it to analysis, with assistance if necessary from specialized forensic examiners. All forensic analysis of the data contained within the Target Device will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

17. *Time of execution:* Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. A forensic extraction of the device's data will be executed, if possible, within 14 days from the issuance of this warrant. The personnel conducting the identification and extraction of data will then complete the analysis within 90 days, absent further application to this court. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time of day or night.

## CONCLUSION

18.     Based on the information in this Affidavit, there is probable cause for a search warrant authorizing the examination of the Target Device described in Attachment A for the items described in Attachment B.


<u>/s Kevin Rutina</u>
TASK FORCE OFFICER KEVIN RUTINA
U.S. DRUG ENFORCEMENT ADMINISTRATION

Subscribed and sworn to before me on this 22nd day of November, 2019.


<u>/s/ Andrea K. Johnstone</u>
HON. ANDREA K. JOHNSTONE
United States Magistrate Judge

## **ATTACHMENT A**

The property to be searched is a cellular telephone with a black front and blue back with IMEI number ░░░░░░3494 and presently assigned call number ░░░░1322 seized on November 20, 2019. The device is currently stored at the Bedford, New Hampshire office of the Federal Bureau of Investigation.

This warrant authorizes the forensic examination of the device for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

All records on the device described in Attachment A that relate to violations of 21 U.S.C. § 846, including:

a. Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

b. lists of customers and related identifying information;

c. types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

d. any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

e. any information involving the travel to obtain controlled substances or the transportation of controlled substances;

f. information reflecting contact or communication with coconspirators, the distribution of controlled substances, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

g. all bank records, checks, credit card bills, account information, and other financial records

h. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.